In the Matter of K. L. H.

No. 10016.

District of Columbia Court of Appeals.

Submitted Sept. 15, 1976.

Decided April 25, 1977.

Michael L. Rankin, Washington, D. C., for appellant.

John R. Risher, Jr., Corp. Counsel, with whom Louis P. Robbins, Principal Asst. Corp. Counsel, Richard W. Barton and Dennis McDaniel, Asst. Corp. Counsels, Washington, D. C., were on the brief, for appellee.

Before KERN, YEAGLEY and HARRIS, Associate Judges.

PER CURIAM:

Appellant was found guilty of robbery after a factfinding hearing in a delinquency proceeding in the Family Division of the Superior Court of the District of Columbia. Four witnesses, three of them members of the Reynolds family, testified that appellant had knocked down, kicked and ultimately wrested away from Mrs. Reynolds her pocketbook and then ran from in front of her house where he had attacked her on a March evening. Appellant and four other witnesses testified that he had been elsewhere on the night in question. The trial thus came down to a question of credibility. Appellant argues, however, that the trial court could not properly evaluate the credibility of the government witnesses because of two errors which occurred at the hearing. First, he asserts that the prosecutor, while cross-examining appellant, improperly

asked whether (1) he had ever been arrested, and (2) he had ever been convicted of a crime. Second, the court refused to call as witnesses the investigating officers to enable the defense to examine them concerning whether the government witnesses had made Jencks Act[1] "statements" and whether these statements had been turned over to the defense at the appropriate time during the factfinding hearing.

■ As to appellant's first assertion of error we note that the court immediately cut into the prosecutor's questioning, precluded any answer being given, and ruled the two questions to be improper (Record at 74–5). We find under these circumstances no error requiring reversal.

Turning to appellant's second contention, the record reflects that at the beginning of the hearing (Record at 3–4), the Assistant Corporation Counsel represented to the court that he had "turned over all Jencks material that is in possession of the Government," including "a police form PD 179, PD 202A, PD Form 251 with a supplemental form PD 202, Police Department Supplemental 252 and a copy of the PD 47, which is a waiver of rights card, and two copies of Detective Gray's notes" (Record at 3). However, after each member of the Reynolds family testified, defense counsel inquired on cross-examination whether he or she had been asked questions by the police at the scene of the purse snatching and, if so, whether the interrogating officer had taken notes of the answers.

The testimony of the complainant, Mrs. Reynolds, was uncertain and confused on the question of which officers were taking notes and whether she answered any questions before being taken to the hospital[2] (Record at 8–10, 15–16). At one point, however, she did testify that a *uniformed* officer took notes (Record at 10). Jacqueline Reynolds, the complainant's daughter, testified that she had been asked questions at the scene by *uniformed* officers and that

she thought one of them was taking notes, *although she wasn't sure* (Record at 27–28). Mr. Reynolds testified that one of the *uniformed* officers questioning him at the scene *and* one of the plainclothes detectives questioning him at the hospital took notes (Record at 38–39). After the testimony of these witnesses, defense counsel, pointing out that "[w]e have the handwritten notes of the detective, Detective Gray," moved for the production "of the handwritten notes of the officer" (Record at 39). The trial court, after examining the papers the government had already turned over to the defense, ruled (Record at 40) that there had been no showing of "the existence of any other materials than what has been handed over" and "what we now see before us [Detective Gray's notes and the various police department forms] could well come within what has been described."

The government's fourth witness then testified; he was an employee of the Highways Department who had been working in the street when appellant ran by him carrying a pocketbook and pursued by Mr. Reynolds. He testified upon cross-examination that he had radioed for the police from his truck, that he had spoken with them when they arrived, and that a *uniformed* officer wrote down what he said (Record at 49). Defense counsel then moved for production of those notes and the trial court, after examining the notes "we now have" (Record at 50), ruled (Record at 51) that "these notes appear to be notes taken in conversation with the witnesses on the form supplemental report, *police department form.* Mr. Nichols' [the Highways Department employee] name is given, some handwritten information is given by him." (Emphasis added.) The trial judge appeared in our view to be making the point that rather than taking rough notes of what the witness said for later transfer to the official police department form, the police officer recorded the relevant portions of the inter-

1. 18 U.S.C. § 3500 (1970).

2. Bruised, crying and "hollering about her leg," and "too upset" to answer questions (Record at

9), the complaining witness had been taken to the hospital where she did answer questions by a detective (Record at 15) whose notes were given to defense counsel (Record at 11).

view directly onto the police department form.

Appellant's argument is that he made a prima facie showing that a uniformed officer, as distinguished from a plainclothes detective, had taken notes during questioning of the government witnesses and that the trial court committed reversible error in failing to call as witnesses the police officers who had responded to the scene to conduct a *voir dire* inquiry into which of them took notes and whether those notes had been produced at trial for the defense.

 We have reviewed the testimony of the witnesses and conclude that the trial judge's examination of the material before him was an adequate response to the showing made by the appellant as to the possible existence of other Jencks Act statements. Administration of the Jencks Act must rest "within the good sense and experience of the [trial] judge," *Palermo v. United States*, 360 U.S. 343, 353, 79 S.Ct. 1217, 1225, 3 L.Ed.2d 1287 (1959), and we can see no abuse of discretion here. Unlike the trial judge in *Hilliard v. United States*, 115 U.S. App.D.C. 86, 317 F.2d 150 (1963), the court here did inquire into the existence *vel non* of Jencks Act material after a prima facie showing by a defendant; and although the trial judge asked what the government's position was on the possible existence of additional Jencks material, the record is clear that the judge did *not* simply rely on the government's statement that all Jencks statements had been produced. *Compare Matthews v. United States*, D.C.App., 322 A.2d 908 (1974). Rather, the judge did recognize his duty to ascertain the existence of Jencks Act statements, *see Campbell v. United States*, 365 U.S. 85, 95, 81 S.Ct. 421, 5 L.Ed.2d 428 (1961), and he discharged that duty. When measured against the strength of appellant's prima facie showing of the possible existence of additional Jencks statements, the court's examination of the

various police report documents already produced without calling every investigating officer who had responded to the scene was within the trial judge's "good sense and experience." [3]

*Affirmed.*

---

3. We note that at defense counsel's request the court ordered Officer Wood to appear at the hearing in connection with the introduction by appellant into evidence of a certain police form (Record at 124). That officer appeared to have interviewed some of the witnesses (Record at 126) and prepared some of the police form reports. Defense counsel did not choose to request examination of this officer, although he was present at the hearing, concerning his taking statements from the witnesses.